THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : Criminal No. 3:18-CR-18 |
| v. | : |
| | : (JUDGE MARIANI) |
| JOHAN M. LARA-MEJIA and | : |
| JOEL MEJIA-BISONO, | : |
| | : |
| Defendants | : |
| | : |

## MEMORANDUM OPINION
### I.  INTRODUCTION

Four motions are pending before the Court in the above-captioned matter:

Defendant Joel Mejia-Bisono's Motion to Suppress Evidence Obtained in Violation of the

United States Constitution (Doc. 56) and Motion to Supplement Motion to Suppress

Evidence Obtained in Violation of the United States Constitution (Doc. 59) and Defendant

Johan Lara-Mejia's Motion to Dismiss Count 5 – 18 U.S.C. § 924(c) (Doc. 69) and Motion to

Suppress Evidence (Doc. 70).  Defendants' motions to suppress are the main focus of this

Memorandum Opinion.  With the suppression motions, Defendants request that the Court

suppress all evidence seized during the warrantless search of September 10, 2017, the

subsequent search conducted pursuant to a search warrant on the same day, and tainted

fruits of such evidence.  (Doc. 56 at 3; Doc. 70 at 3.)  As a result of evidence obtained

during the searches at issue, Defendants were charged in a five-count Indictment on

January 23, 2018.  (Doc. 1.)  The Indictment charges both Defendants with Conspiracy to

Distribute Controlled Substances in violation of 21 U.S.C. § 846, three counts of Possession

with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841 (a)(1), and

Possession of a Firearm in Furtherance of Drug Trafficking Crime in violation of 18 U.S.C. §

924(c). (Doc. 1.)   Upon consideration of the motions, related documents, and evidence

presented at the Suppression Hearing held on December 17, 2019, the Court will grant the

Motion to Supplement Motion to Suppress Evidence Obtained in Violation of the United

States Constitution (Doc. 59), deem withdrawn the Motion to Dismiss Count 5 – 18 U.S.C. §

924(c) (Doc. 69), and deny the Motion to Suppress Evidence Obtained in Violation of the

United States Constitution (Doc. 56) and Motion to Suppress Evidence (Doc. 70)

## II.    BACKGROUND

On September 10, 2017, Pennsylvania State Police ("PSP") officers were dispatched

to the Ramada Inn in Hazle Township, Pennsylvania, in response to a complaint from the

hotel clerk of suspected drug activity.  (Doc. 66 at 3.)  Upon arrival at approximately 2:47

a.m., the clerk told the officers that an anonymous tip had been received about suspected

drug activity in Room 212.  (*Id*.)  At approximately 3:10 a.m., the officers knocked on the

door of Room 212.  (*Id*.)   The Ramada is a two-story structure.  (*Id*. at 3 n.2.)   Entrance

doors to the hotel rooms open to the outside and each room has at least one large double

window with curtains.  (*Id*.)

2

The parties' recitations and testimony concerning what happened next differs somewhat.[1]

## A.   <u>Government</u>

In the Brief of the United States in Opposition to Joel Mejia-Bisono's Motion for Suppression of Evidence (Doc. 66), the Government provided the following summary of events which transpired after they knocked on the door of Room 212.[2]

> [T]he occupants inside the room opened the curtains and two males, later identified [sic] Joel Mejia-Bisono and codefendant Johan Lara-Mejia, could be seen by officers. The males, yelling through the door, inquired who was there. PSP officers identified themselves and asked the males to step outside to speak with them.
>
> The males opened the door only wide enough to squeeze their bodies out into the hallway of the upstairs balcony and left the door slightly ajar. . . . As some initial inquiry about the report of drug activity began, officers immediately noticed that both males appeared shaky and nervous. Both males were observed to have blood shot eyes and Mejia-Bisono was immediately observed to have a white powdery substance on his pant legs, consistent with narcotic packaging and consistent with the anonymous caller's report. The males became increasingly nervous as the conversation with the officers ensued. Suddenly, for no apparent reason and in a manner seemingly fake to officers, Mejia-Bisono stumbled forward and pulled the door closed behind him and immediately stated that now they were locked out of the room.

---

[1] Insofar as the parties present divergent renditions of relevant facts in their briefs in support of, and opposition to, the pending motions, the Court identifies same and includes the alternative factual assertions in the background presented. The parties' factual recitations do not include citations to specific discovery material relied upon but, in some instances, provide a general reference to the Affidavit of Probable Cause executed by the Pennsylvania State Police ("PSP"). (Doc. 58 at 3-5; Doc. 66 at 3-9; Doc. 75 at 1-3; Doc. 81 at 1-7.)

[2] In the Brief of the United States in Opposition to Johan Lara-Mejia's Motion for Suppression of Evidence (Doc. 81), the Government provides similar background information.

(Doc. 66 at 3-4.)  The Government states that when the door was locked,

> Trooper Williams stated that would not be a problem because the hotel manager could easily let the defendants back into the room. At that point, Mejia-Bisono's codefendant, Lara-Mejia, walked by himself down to the manager's office. Shortly thereafter, both Mejia-Bisono and one of the PSP officers followed to assist in finding the manager. Meanwhile, Trooper Williams remained outside Room 212. However, from his lawful position, Trooper Williams was able to see through an opening in the curtains and observed what he believed to be piles of packaging material and other paraphernalia consistent with packaging of illegal narcotics, and consistent with having observed a powdery substance on Mejia-Bisono pant legs. Trooper Williams was not in a position to manipulate the curtains. Rather, the curtains were positioned from inside of the room, which remained locked at that time.
>
> After a few minutes, Trooper Stemrich returned to the area outside of Room 212 with the two defendants and the hotel manager who had the key to open the room. As the manager stepped forward to unlock the door to allow the defendants access, Mejia-Bisono suddenly stepped in front of the door aggressively reaching his hands toward the neck of the manager and telling her not to open the door. Trooper Williams reacted by directing the Mejia-Bisono to step away from the manager and not to touch her. As the manager continued toward the act of unlocking the door (because Mejia-Bisono just moments prior lamented that they were now locked out of the room), both defendants took flight and ran down the outside hallway toward the exit stairway down to the parking lot.

(Doc. 66 at 5-6.)  The Government states that both Troopers Williams and Stemrich pursued

Defendants across the parking lot and into the nearby woods.  (Doc. 66 at 6.)  Mejia-Bisono

was ahead of Lara-Mejia, and was able to get away,[3] but "Trooper Williams was able to

apprehend Lara-Mejia with the assistance of Trooper Stemrich."  (*Id*.)  According to the

Government, "Lara-Mejia was walked back to outside Room 212 where he was searched

---

[3]  The Government states that Mejia-Bisono was not apprehended until April of 2018 in New York City due to fugitive location efforts by the U.S. Marshal Service.  (Doc. 66 at 7.)

incident to arrest. Five and a half bundles of suspected heroin were seized from his person." (Doc. 66 at 6-7.)  Thereafter, the hotel manager unlocked Room 212 and the Government states that PSP officers then "quickly swept the room for the safety of everyone involved and secured the scene in order to obtain a search warrant.  In plain view were piles of packaging materials including boxes of glassine packets and several piles of unknown white powders. Officers immediately secured the room and sought a search warrant."  (*Id.* at 7.)

On September 10, 2017, at approximately 9:55 a.m., a search warrant was executed on Room 212 by members of the Clandestine Laboratory Response Team ("CLERT"). (Doc. 66 at 7 n.3.)  Items seized from the room include the following:

1. A Meloir Brand .25 caliber pistol, serial # 4399 (silver);

2. A wallet containing MEJIA-BISONO's social security card;

3. Several documents belonging to Lara-Mejia and a set of keys;

4. A digital scale and plastic bags with unknown white powder;

5. A Hamilton Beach electric grinder with residue;

6. Plastic bags with various types of packaging materials with reside [sic];

7. Numerous (thousands) of yellow glassine baggies;

8. Two plastic Ziploc bags with one half filled with rice and multiple bundles of

   suspected heroin.[4]

---

[4] The Government notes that Lab reports indicate that the bulk of the white powder was fentanyl, a Schedule II controlled substance. (Doc. 66 at 8 n.4.)  Other substances were determined to be heroin, a Schedule I controlled substance, and methamphetamine, a Schedule II controlled substance.  (*Id.*)

(Doc. 66 at 8.)

## B.    Defendants

Defendant Lara-Mejia states that the discovery received by him makes no mention of

the details regarding "squeezing" their bodies out of the room and the alleged sudden

activities of Defendant Mejia-Bisono.  (Doc. 75 at 2 n.2.)  In his general recitation of events,

Defendant Mejia-Bisono states that Defendant Lara-Mejia

> inched aside the curtain, peeked at the troopers through the window, and
> rejoined the curtains, the troopers ordered the occupants of the hotel room to
> open the door. Initially, Mr. Mejia-Bisono cracked the door open to face the
> officers alone; Mr. Lara-Mejia remained behind. When the troopers
> communicated that all occupants of the room were required to exit, Mr. Lara-
> Mejia came into the hallway with Mr. Mejia-Bisono. Once in the hallway, the
> defendants allowed the door to close behind them, and the door locked
> automatically.  Several times, the troopers ordered the defendants to open the
> door.  The defendants, several times, communicated that they did not wish to
> open the door, and in any event, explained the defendants, they had locked the
> key inside. The troopers ordered the defendants to obtain a spare key from the
> Ramada's front desk person, and Mr. Lara-Mejia left to do so. After some time,
> the desk manager came to the room with a spare key. Mr. Mejia-Bisono again
> protested against opening the door.  The troopers ordered Mr. Mejia-Bisono to
> allow the desk manager to proceed, which she did. Once they recognized that
> the troopers would not relent in the face of protest, the defendants fled. After
> the troopers returned from the chase, they entered the hotel room and
> observed contraband in plain view.
>
> Later that morning, a Magistrate issued a search warrant for the hotel
> room upon the affidavit of trooper Mark F. Baron. (Decl. Ex. A). The Baron
> Affidavit includes information from the warrantless seizure of defendants and
> search of the hotel room earlier that morning. It also sets forth several
> knowingly false statements, including that the defendants were "nervous" and
> "fidgety" and "had blood shot eyes"; that one defendant appeared "to have a
> white powder residue on his pants"; and that "[t]roopers looked through the
> window of Room 212 and observed piles of what appeared to be packaging

material consistent with material that is used for packaging illegal narcotics on a table to the rear of the room."

(Doc. 58 at 3-4 (*see also* (Doc. 72-1 (Meiia-Bisono Aff. ¶¶ 2-14)).)  Regarding the effort to obtain a key to the door, Mejia-Bisono's Affidavit adds that "[a]fter Mr. Lara-Mejia had been gone for some time, one of the troopers escorted me towards the Ramada's front desk. Before we could get very far, however, Mr. Lara-Mejia appeared with the front desk person." (Doc. 72-1 ¶ 11.)  He also states that his "recollection is that the curtains of the room were opaque and completely closed" at the time he left to go to the front desk.  (*Id.* ¶ 14.)

## C.   Suppression Hearing

At the December 17, 2019, Suppression Hearing, the Government called three witnesses: Pennsylvania State Troopers Williams and Stemrich who were called to the Ramada on September 10, 2017, and Corporal Mark Baron of the Pennsylvania State Police, the on-call criminal investigator on September 10, 2017, who was asked to assist Willaims and Stemrich and prepare the affidavit for the search warrant.  (Doc. 89 at 2, 135-36 (Hr'g Tr. 2, 135:12-136:7).)   Defendants called Beth Shreffler, the manager at the Ramada Inn on September 10, 2017.  (Doc. 89 at 152 (Hr'g Tr. 152:12-14).)

The testimony of Williams and Stemrich was largely consistent with the facts presented in the Government's earlier briefing (Docs. 66, 81).  In some respects, their testimony conflicted with Shreffler's recollection of events.  The Court will focus the following review of testimony on matters which officers clarified and/or expanded upon, and on matters where witnesses presented conflicting testimony.

Regarding the response to their initial knock on the door of Room 212, both officers

testified that one man opened the curtain slightly, looked quickly, and closed the curtain.

(Doc. 89 at 14, 90 (Hr'g Tr. 14:7-14, 90:9-14).)  Immediately thereafter, a second male did

the same thing.  (*Id*. (Hr'g Tr. 14:14-15, 90:15-16).)  Stemrich testified that the officers

knocked again, announced themselves, and asked that the occupants come out of the room

to speak with them "just to speak about the welfare of the occupants of the room and

everything like that, from the anonymous tip."  (*Id.* at 91 (Hr'g Tr. 91:5-8).)  The two men did

so, opening the door "just barely enough to get their bodies out" and then left the door open

just a crack.  (*Id*. at 15, 91 (Hr'g Tr. 15:9-17, 91:11-18).)  While the two officers and two

room occupants were talking outside the room, Lara-Mejia shut the door.  Williams testified

that this occurred after he told them

> we were there for a disturbance.  I asked if anyone else was in the room, if
> everyone was okay.  I asked if it would be okay if we came in to the room to
> see if anything was going on, that nobody is having a party, no domestics, no
> kind of disturbances of any kind were going on that would cause concern to
> anybody else.

(Doc. 89 at 17 (Hr'g Tr. 17:10-15).)

Williams further testified that both men then "made statements to the effect of, now

they're locked out, they can't get in.  I told them, that's not really a big deal, they could just

go down to the manager, they'll have a spare, they can let them back into their room."  (*Id*.

at 19 (Hr'g Tr. 19 5-10).)  Lara-Mejia went to get the key and, when he did not return in what

was believed to be about ten minutes, Stemrich and Mejia-Bisono went to see what was

going on.  (*Id*. at 21 (Hr'g Tr. 21:3-9).)

When asked what he did while alone outside the room, Williams testified that

with everyone gone, I stick my face up against the glass and try peeking through the curtains. . . . I'm able to get small peeks inside the room. . . . I see what's consistent with packaging material for narcotics, waxing packets, and a table pushed all the way in the back.  I can't tell what's on the table, but the way it's set up is consistent with a narcotics packaging operation.  I could tell there's stuff on the table.

(Doc. 89 at 21-22 (Hr'g Tr. 21:17-18, 20, 22-21:1).)

After Stemrich, Lara-Mejia, Mejia-Bisono, and Shreffler arrived back at Room 212,

Williams testified that Shreffler

goes to unlock the hotel for them, there's some conversation back and forth between them about whether or not they want her to unlock the hotel, then she says, basically, it's my hotel, you called me up here, I'm going to unlock the hotel room and open the door. . . . As she steps toward the door with the key, Mejia-Bisono steps toward her aggressively with his hands raised toward her neck, at which point, that's when I gave him the command to step back and not touch her.

(Doc. 89 at 23 (Hr'g Tr. 23:10-14, 16-19).)  When asked if he ordered the manager to open

the door, he said he did not.  (*Id.* (Hr'g Tr. 23:22-24).)  When asked what happened next,

Williams testified that "[o]ne of them yelled something, I didn't make it out, and then they

both began running." (*Id*. at 24 (Hr'g Tr. 24:3-5).)  When asked if the door had been opened

at all at that point, Williams responded that it had not.  (*Id*. (Hr'g Tr. 24:7-9).)

On cross-examination, Williams confirmed his earlier testimony. (Doc. 89 at 61 (Hr'g

Tr. 61:8-17).) When asked if Shreffler asked his partner whether she should open the door,

Williams said that he did not recall. (*Id*. (Hr'g Tr. 61:18-19).)

Stemrich testified that, upon return to Room 212,

[t]he manager had said to the effect of, It's my hotel, I want to open this door,
I'm going to open the door. At which point, one of the males made a threatening
movement towards the manager to try and prevent them from opening the
room.

At that point, Trooper Williams had told the male, Don't touch her,
essentially, you can't just assault people. At which point, they yelled something
in Spanish, I don't recall exactly what they yelled, and both males took off
running.

(Doc. 89 at 95-96 (Hr'g Tr. 95:21-96:3).) Stemrich confirmed that neither he nor Williams

ordered Shreffler to open the door. (*Id*. at 98 (Hr'g Tr. 98:7-14).)

On cross-examination, Stemrich confirmed his earlier testimony. (*Id*. at 117-18 (Hr'g

Tr. 117:22-118:12).) Stremrich's recollection was also that the door had not been opened

before Mejia-Bisono and Lara-Mejia fled. (*Id.* at 119 (Hr'g Tr. 119:21-25).)

Both Williams and Stemrich testified that they did not stop Shreffler from opening the

door, noting that events were happening quickly at that point: Mejia-Bisono stepped forward

in a threatening manner toward Shreffler, both he and Lara-Mejia immediately fled when

Williams directed Mejia-Bisono to step back, and both officers took off in pursuit of

Defendants. (*See, e.g.*, Doc. 89 at 23-24, 62-64, 95-96, 118-19.)

Shreffler testified that she returned to Room 212 with Lara-Mejia and the officers and Mejia-Bisono were all outside the door.  (*Id.* at 158 (Hr'g Tr. 158:13-24).)  When asked if the officers appeared "to have any sort of heightened suspicion or anything like that," Shreffler responded that it did not seem so, stating "I didn't take it they were overly suspicious of anything going on."  (*Id.* at 159 (Hr'g Tr. 159:7-12).)  The following exchange then took place:

> Q.  And at a certain point, did one of the officers instruct you to open the door?
>
> A.  They did ask me to open the door, one of the gentlemen said not to.  And when you checked into the hotel, you know, they signed a paper that if we thought there was suspicious activity in the room, we would check the room.
>
> So I told him, I was the manager, I was going to open the door, we wanted to just double-check everything, make sure everything was safe.
>
> Q.  So you did all that, only after the officer had said to open the door?
>
> A.  Yes.
>
> Q.  And after the other gentleman said, Don't open the door?
>
> A.  Correct.

(Doc. 89 at 159-160 (Hr'g Tr. 159:13-160:1).)  Shreffler was also asked whether "one of the gentlemen . . . at any time, did he attempt to assault or strangle you by the neck area?"  (*Id.* at 160 (Hr'g Tr. 16:18-20).)  She answered as follows: "No. After I did open the door, I did get shoved into, like, the doorway, but that was in an effort for them to leave. . . . It wasn't an attempt for them to hurt me, I don't believe."  (*Id.* at 160-61 (Hr'g Tr. 160:23-161:1).)

On cross examination, Shreffler confirmed that when she first talked with investigators about the incident "the police said, Hey, you have the master key, would you please open the door for them, right?" which she "characterized to the investigator as a request, not a command." (*Id*. at 178 (Hr'g Tr. 178:10-11, 13-15).) When the Government attorney pointed out that the October 2018 investigation report indicated that she "recalled that the men who were locked out of the room did not say anything" to her, Shreffler said that she knew one of the men said not to open the door, but the other one had already come down and asked for a key, so it didn't make sense not to open the door." (*Id.* at 178-79 (Hr'g Tr. 178: -179:1).)

Regarding physical contact just before Mejia-Bisono and Lara-Mejia fled, Shreffler agreed that she was facing the door at the time with no idea what the man behind her was doing so it was possible that the man was coming towards her. (*Id.* at 186-87 (Hr'g Tr. 186:20 -187:2).)

## D.    Warrant Affidavit

In the Affidavit of Probable Cause, Trooper Mark Baron set out

the following facts thus far gathered through investigation:

On September 10, 2017, the Pennsylvania State Police – Troop N, Hazleton barracks was informed by a manager at the Ramada Inn . . . of suspected drug activity occurring at that location in Room 212.

On September 10, 2017, at approximately 0247 hours, Troopers arrived at the Ramada Inn and spoke with the manager who stated that they had received an anonymous tip from an individual stating that "Daniel PENA" in Room 212 was

either selling or using drugs and that crystal methamphetamine and heroin was being packaged in the room.

Troopers then knocked on the door of Room 212 at approximately 0310 hours. The curtains on the hotel room were pulled back by two different individuals inside of the room and then closed. Troopers again knocked on the door and requested that the individuals exit the room in order to talk with them about the complaint. Two hispanic males (Joel MEJIA-BISONO and Johan LARA MEJIA) exited the room and closed the door to the room behind them "locking" themselves out. Troopers found both individuals to be nervous, fidgety, had blood shot eyes and one individual to have a white powder residue on his pants.

Troopers looked through the window of Room 212 and observed piles of what appeared to be packaging material consistent with material that is used for packaging illegal narcotics on a table to the rear of the room.

The manager of the Ramada Inn, then arrived at Room 212 at the request of the two hispanic males who had exited that room earlier to unlock the door for them. As the manager went to unlock the door, MEJIA BISONO stepped in front of the manager to stop her from doing so. Prior to the room being opened, both individuals ran from the location.

After a brief pursuit, one suspect was detained. Troopers then returned to the room and performed a cursory search of the room for any additional suspects. Troopers observed, in plain view, numerous wax baggies commonly utilized for packaging narcotics. In addition, a quantity of a white powdery substance was observed on the table along with an apparent digital scale and additional wax baggies. This would suggest that possible distribution of narcotics was taking place and was not for personal use.

Based on the above information, I am requesting a search warrant be issued for Room 212 located at 1221 North Church Street, Hazle Township, Luzerne County in order to further this investigation.

(Doc. 57-1 at 2.)

## III. ANALYSIS

As a preliminary matter, the Court will grant Defendant Mejia-Bisono's Motion to

Supplement Motion to Suppress Evidence Obtained in Violation of the United States

Constitution (Doc. 59) with the effect that the Court will consider the argument set out

therein when assessing the merits of Defendant's Motion to Suppress Evidence Obtained in

Violation of the United States Constitution (Doc. 56).

Defendants seek to suppress evidence seized during the warrantless search of

September 10, 2017, suppress evidence seized in the subsequent search pursuant to the

warrant, and suppress the tainted fruits of such evidence.  (Doc. 58 at 3; Doc. 70 at 5.)

Thus, the motions are based on the Fourth Amendment exclusionary rule.

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures ... and no Warrants shall
> issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to
> be seized.

U.S. Const. amend. IV (West 2002).  As stated in *United States v. Butler*, 405 F. App'x 652

(3d Cir. 2010),

> [t]his provision limits government action in two related ways. First, it requires
> that the government conduct only reasonable searches and seizures. Second,
> it sets out (albeit at a high level of generality) the prerequisites that government
> officials must complete before executing a search or seizure, which include
> obtaining a warrant. "The Supreme Court has read the Amendment's twin
> commands in tandem, holding that when people have a reasonable expectation
> of privacy in their persons or effects, all searches and seizures must be
> supported by a warrant, unless they fall into one of the exceptions to that

requirement." *United States v. Hartwell,* 436 F.3d 174, 177 (3d Cir.2006) (citing *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

*United States v. Butler*, 405 F. App'x 652, 655 (3d Cir. 2010).  "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).

Under the exclusionary rule "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."  *United States v. Calandra,* 414 U.S. 338, 347, (1974). This prohibition also applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348; *United States v. Leon,* 468 U.S. 897, 906 (1984).

There are exceptions to the general rule that law enforcement must obtain a warrant conducting a search of a home, though the Supreme Court has noted that

> [p]rior decisions of this Court . . . have emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," *United States v. United States District Court*, supra, 407 U.S. [297, 318 (1972)], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

*Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).[5]  As stated by the Court of Appeals for

the Third Circuit,

> [w]arrantless searches of the home "are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." [*United States v. Coles,* 437 F.3d 361, 365 (3d Cir. 2006)] (emphasis in original) (citing *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton* [*v. New York,* 445 U.S.573, 586, 100 S.Ct. 1371 (1980)]. We evaluate whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy." *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).
>
> Exigent circumstances exist when officers are in hot pursuit of a fleeing suspect, *Coles,* 437 F.3d at 366, when they "reasonably ... believe that someone is in imminent danger," *Couden v. Duffy,* 446 F.3d 483, 496 (3d Cir.2006) (internal citation and quotation marks omitted), or when they reasonably believe that they must act "to prevent the imminent destruction of evidence," *Brigham City,* 547 U.S. at 403, 126 S.Ct. 1943 (citing *Ker v. California,* 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality opinion)). The common thread is imminence—"the existence of a true emergency." *United States v. Simmons,* 661 F.3d 151, 157 (2d Cir.2011). "[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." *United States v. Murphy,* 516 F.3d 1117, 1121 (9th Cir.2008) (citing *Mincey v. Arizona,* 437 U.S. 385, 392– 93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)), *abrogated on other grounds by Fernandez v. California,* [571 U.S. 292], 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014).

*United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014).

---

[5] Warrant requirements also apply to a hotel room: "[f]rom the overnight guest's perspective," the expectation of privacy in a hotel room is entitled to the same respect as afforded one's actual home under the Fourth Amendment. *Minnesota v. Olson,* 495 U.S. 91, 99 (1990).

A defendant who seeks to suppress evidence based on a claimed Fourth

Amendment violation bears the initial burden of establishing a basis for his motion. *United*

*States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d

1248, 1256 n.9 (3d Cir. 1992). However, as *Johnson* explained, "once the defendant has

established a basis for his motion, *i.e.,* the search or seizure was conducted without a

warrant, the burden shifts to the government to show that the search or seizure was

reasonable." *Id.* (citing *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993)).

"It is well-settled that at a hearing on a motion to suppress, the credibility of

the witnesses and the weight to be given the evidence, together with the inferences,

deductions, and conclusions to be drawn therefrom, are all matters to be determined by the

trial judge." *United States v. Britton*, No. 1:13-CR-0014, 2013 WL 1856532, at *1 (M.D. Pa.

May 2, 2013), *aff'd*, 608 F. App'x 111 (3d Cir. 2015) (citing *United States v. Staten,* 181 F.

App'x 151, 156 (3d Cir.2006)). The trial judge may accept or reject any or all of a witness's

testimony and determines credibility based on a number of factors, "including

the witness's ability to accurately recollect the matters at hand, the extent to which the

testimony is corroborated or contradicted by other evidence, and whether the testimony

withstands a common sense test of reason and logic." *United States v. Murphy*, 402 F.

Supp. 2d 561, 569 (W.D. Pa. 2005).

Defendants' filings identify the following specific issues: 1) whether the troopers

lacked reasonable suspicion to seize Defendants at the time Defendants exited the hotel

room and thereafter;[6] 2) whether the initial search of Room 212 was unlawful; and 3)

whether the Affidavit of Probable Cause in support of the Search Warrant contains

intentional and false statements material to the finding of probable cause.   (Docs. 58, 59,

71, 75, 81.)   The Government raises the additional issue of Defendants' standing to

challenge the search of Room 212.   (Doc. 66 at 10; Doc. 81 at 8.)   The Government also

contends that the plain view doctrine and inevitable discovery doctrine apply to this case.

(Doc. 66 at 19, 28.)

Because resolution of the standing issue depends, in part, on when the seizure of

Defendants occurred, the Court will first address that issue.

## A. Seizure

Defendants claim that they were seized when they exited the hotel room.   (*See*, *e.g.*,

Doc. 94 at 8; Doc. 95 at 26.)   The Government maintains that no seizure of either Defendant

_____

[6] This issue is identified in the "Motion to Supplement Motion to Suppress Evidence Obtained in Violation of the United States Constitution" (Doc. 59.)   Defendant Mejia-Bisono's counsel, Elliot Smith, filed this motion on December 11, 2018, the day after he filed his "Motion to Suppress Evidence Obtained in Violation of the United States Constitution" (Doc. 56).   Smith did not file a supporting brief with the motion and he did not have concurrence, but stated the following:

4.Defense counsel has attempted to contact government counsel to obtain the government's consent to this Motion, but has been unable to reach counsel for the government.

5. Because defense counsel believes this Motion fully sets forth the reasons for the Motion and the relief sought, he is not filing a Brief in Support, but stands ready to do so should the Court so require.

(Doc. 59 at 3.)   As indicated in the text, the Court will grant the Motion to Supplement.   *See supra* p. 14. However, for reasons discussed later in the text, the issue is not germane to the Court's disposition of Defendant Mejia-Bisono's Motion to Suppress Evidence Obtained in Violation of the United States Constitution (Doc. 56).

occurred until after Defendants took flight and Lara-Mejia was apprehended.  (Doc. 93 at 23.)

In *Florida v. Bostick,* 501 U.S. 429, (1991), the Supreme Court stated that "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439.  To do this, a court must first determine *when* the seizure occurred, and evaluate only "the facts available to the officer at the moment of the seizure." *United States v. Brown,* 448 F.3d 239, 245 (3d Cir.2006) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)).

The Third Circuit Court of Appeals set out an extensive analysis of the relevant inquiry:

> The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal quotation marks omitted). But not every interaction between a police officer and a citizen is protected by the Fourth Amendment. An encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.... 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868); *see also California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Mendenhall,* 446 U.S. at 553, 100 S.Ct. 1870. Yet "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by

approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton,* 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). In fact, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, [and] ask for identification" without running afoul of the Fourth Amendment's prohibitions. *Id.* at 201, 122 S.Ct. 2105.

Whether an encounter with a police officer constitutes a search and/or seizure under the Fourth Amendment requires consideration of "all the circumstances surrounding the encounter." *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382. Any inquiry into an alleged seizure must begin by determining when the seizure occurred. *See United States v. Torres,* 534 F.3d 207, 210 (3d Cir.2008) ("The initial step of a Fourth Amendment suppression analysis requires us to determine the timing of the seizure."). The timing of the seizure is significant—if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure. But if the seizure occurred before the flight, as the District Court found here, then the flight "plays no role in the reasonable suspicion analysis." *United States v. Brown,* 448 F.3d 239, 245 (3d Cir.2006). As such, any seizure inquiry has two steps: Was there in fact a seizure? If so, was that seizure reasonable?

The Supreme Court provides us with guidance. In *Mendenhall,* the Court listed several factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554, 100 S.Ct. 1870. In *Hodari D.,* the Court provided further clarification, holding that the *Mendenhall* test was "a necessary, but not a sufficient condition for seizure—or, more precisely, for seizure effected through a 'show of authority.' " 499 U.S. at 628, 111 S.Ct. 1547 (emphases omitted). In *Hodari D.,* the Court held that a seizure does *not* occur when the subject does not yield to a show of authority. 499 U.S. at 626, 111 S.Ct. 1547. To be clear, a seizure "requires *either* physical force ... *or,* where that is absent, *submission* to the assertion of authority." *Id.* The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized.

Furthermore, "[w]hen the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs

to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin v. California,* 551 U.S. 249, 127 S.Ct. 2400, 2405, 168 L.Ed.2d 132 (2007) (discussing the application of the *Mendenhall* test after *Hodari D.).* "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.,* 499 U.S. at 628, 111 S.Ct. 1547.

*United States v. Smith*, 575 F.3d 308, 312–13 (3d Cir. 2009). *Smith* reviewed the

circumstances of *Johnson v. Campbell,* 332 F.3d 199 (3d Cir.2003), where the Circuit Court

had found a seizure and noted that it

> identified the officer's persistent request to roll down the window, which continued even after Johnson made the choice not to acquiesce, as a defining feature which turned the encounter into a seizure. *Id.* at 206. At that moment, it was evident to a reasonable person "that Johnson was not free to ignore him and would not be left alone until he complied." *Id.* Furthermore, the officer told Johnson he was being detained.

*Smith*, 575 F.3d at 314.

The Circuit Court distinguished the facts in *Smith* from those in *Johnson* because

Smith's initial and subsequent responses to officers' questions "were not clearly a refusal to

consensually engage." *Id.* *Smith* noted that one of the officers testified

> "we didn't know what was going on, why he kept giving us the same answer to different questions[]" . . . [so] [i]t was reasonable for the police officers to re-state the question as they had been given a nonsensical answer. There was no overt indication the questioning was not part of a consensual encounter between the officer and Smith as there was in *Johnson.*

*Id.*

Because Williams and Stemrich applied no physical force before apprehending Lara-

Mejia subsequent to flight, as in *Smith*, whether a Fourth Amendment seizure occurred

earlier here is the question of "'whether the officer's words and actions would have

conveyed . . . to a reasonable person'" that he was "'being ordered to restrict his

movement.'"  575 F.3d at 313 (quoting *Hodari D.,* 499 U.S. at 628).

The Government relies on *Mendenhall* in support of its position that no seizure

occurred before Lara-Mejia was apprehended following flight.  (Doc. 93 at 23-27.)

Defendant Mejia-Bisono relies heavily on *Johnson* and the fact that officers knocked on the

door of Room 212 a second time after Defendants looked out the window and did not exit

the room.  (Doc. 95 at 27-30; Doc. 96 at 5.)  Defendant Lara-Mejia relies on *Mendenhall* and

*United States v. Hester*, 910 F.3d 78 (2018), in support of his proposition that

> [t]he occupants of the room were clearly seized when they exited the room as
> they yielded to the show of authority by the Troopers.  Any reasonable person
> would have believed that they had no choice but to come out of the hotel room
> when requested by police to do so at least twice, if not more times.  Additionally,
> Defendant Mejia-Bisono had previously been arrested by Trooper Williams.

(Doc. 94 at 8 (citing Doc. 89 at 16 (Hr'g Tr. 16:22-23)).)

The Court concludes that *Mendenhall f*actors indicative of a seizure--"the threatening

presence of several officers, the display of a weapon by an officer, some physical touching

of the person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled," 446 U.S. at 554—are not present

here.  The only potentially applicable factor is the tone of voice used by officers outside

Room 212 in communicating with Defendants when they were inside the room.  While

Defendant Mejia-Bisono asserts that officers "used 'elevated' voices, perhaps as loud as a

'yell,' to announce their authority and repeat their purpose" (Doc. 95 at 30), no evidence indicates that the officers used a threatening tone of voice.  Rather, Williams explained that, when he was speaking to the men on the other side of the door, if his voice was elevated above the tone he was using in the courtroom at the Suppression Hearing, it was "to let them hear me" (Doc. 89 at 45 (Hr'g Tr. 89:8-13)).  Testimony shows there was some conversation through the door before Defendants exited the hotel room (*see*, *e.g.*, Doc. 89 at 44-45) and officers, who did not speak Spanish, were communicating with primarily Spanish-speaking individuals.  No evidence shows that Defendants clearly refused to consensually engage with Williams and Stemrich.  *See Smith*, 575 F.3d at 314.

Although Defendant Mejia-Bisono states in his opening brief that "the troopers ordered the occupants of the hotel room to open the door" and "communicated that all occupants of the room were required to exit" (Doc. 58 at 3-4), Defendants chose not to testify and, at the Suppression Hearing, presented no testimony or evidence contradictory to that of Williams and Stemrich related to the initial encounter between the officers and Defendants.  Reports of the officers' use of commands and threatening language are undermined by Shreffler's testimony that, when in the presence of the officers and defendants outside Room 212, she "didn't take it they were overly suspicious of anything going on."  (Doc. 89 at 159 (Hr'g Tr. 159:7-12).)

Rather than events in the hallway exemplifying Defendants' acquiescence to a show of authority, the fact that Lara-Mejia went to get a key for the room without accompaniment

23

by an officer and without extensive discussion on the matter demonstrates freedom of independent movement.  No evidence suggests that either Defendant sought to end the encounter before Lara-Mejia left, during his absence, or as soon as he returned with the key.  No evidence suggests that Mejia-Bisono stated that he wanted to accompany Lara-Mejia and the officers did not allow him to do so.  No evidence suggests that, when Lara-Mejia did not immediately return with the key, Mejia-Bisono expressed a desire to seek Lara-Mejia's whereabouts on his own, nor did the officers insist that he be accompanied by one of them when he went to see what was going on.  In these circumstances, the Court concludes that, as in *Smith*, there was no "overt indication" that the interaction in the hallway preceding Lara-Mejia's solo trip to the front desk to secure a key for the room was not part of a consensual encounter.  575 F.3d at 314.

In making this determination, the Court has considered Defendant Lara-Mejia's contention that the fact that he was able to obtain the key from the manager does not indicate that he had not previously been seized.  (Doc. 94 at 9.)  In support of his averment, Lara-Mejia states that "the Defendants were unable to simply get the key and enter the hotel room without prospect of further interference with their constitutionally protected rights by the troopers, therefore, a seizure occurred implicating Fourth Amendment protections."  (*Id.*)  This conclusory assertion is based on speculation of future events rather than facts of record.  At most, Lara-Mejia's statement shows a belief in a "prospect" of seizure based on

what may happen *after* Lara-Mejia returned with the key.  Thus, his statement provides no support for the conclusion that a seizure had previously occurred.

The Court has also considered Defendant Mejia-Bisono's assertions regarding the officers' credibility concerning their conduct before Defendants opened the door, after Defendants exited the room, and when Defendant Lara-Mejia returned with the key.  (Doc. 95 at 16-22.)  The Court disagrees that what Mejia-Bisono calls "a selective inability to recall information" (*id.* at 16) is indicative of a lack of credibility on the part of Williams and Stemrich.  At the Suppression Hearing, the Court did not find officers' testimony regarding precisely what had occurred before and after Defendants exited the room indicative of a lack of credibility.  The Suppression Hearing took place over two years after the events in question and a failure to recall with particularity what was said after that lapse of time did not appear attributable to anything but the passage of time.  In fact, the Court would have been more likely to find the officers' credibility undermined if they had been able to recite verbatim what had been said, provide exact details of their actions and those of Defendants, and if the recollections of Williams and Stemrich had been in lockstep.

Further, Defendant Mejia-Bisono's statement that the officers' reports of Defendants' conduct and demeanor was inconsistent with their conduct (Doc. 95 at 19) does nothing more than second-guess why officers proceeded with a consensual encounter rather than arrest Defendants as soon as one or both officers believed they had sufficient evidence to do so.  The fact that testimony showed that officers exhibited restraint in their approach to

events that transpired did not lead the Court to find their testimony suspect at the Suppression Hearing and does not now lead the Court to do so.

Defendant Mejia-Bisono's reliance on the dubiousness of Officer Williams' claim that he was able to peek through curtains and saw narcotics packaging materials (Doc. 95 at 19-20) is similarly unavailing.  Given the drug-related activity that officers already suspected, the fact that Williams did not tell Stemrich what he had seen immediately upon Stemrich's return to the hallway outside Room 212 with both Defendants and Shreffler in very close proximity is interpreted by the Court to be a situational decision.  Since Williams' testified that he had confirmed what was suspected, the fact that he did not immediately share that information did not undermine his credibility.  In other words, the Court found it understandable, given the totality of the circumstances, that Williams may not have considered sharing the information with Stemrich to be his paramount concern at the moment.  Williams would not have been "putting his partner in danger" because both Williams and Stemrich had been alerted to illegal drug activity in Room 212 and both officers would have been prepared for what had been seen and what was later discovered. Thus, based on the testimony and facts known to the officers at the time, the Court disagrees with the assertion that Williams' failure to immediately tell Stemrich about what he had observed makes it "more likely that Williams never saw paraphernalia through the window to Room 212" (Doc. 95 at 21).

The Court also disagrees with Mejia-Bisono's assertion that Shreffler's testimony buttresses the conclusion that Williams did not see the paraphernalia as reported (Doc. 95 at 21).  Shreffler's testimony that, when she arrived outside Room 212, the officers did not seem "overly suspicious of anything going on" (Doc. 89 at 159 (Hr'g Tr. at 159:7-12)) is not inconsistent with Williams' suspicions having been confirmed by what he saw.  Behavior on the part of officers consistent with a tactical strategy of remaining calm and proceeding with a consensual encounter as long as possible raises no red flag as to credibility.  Shreffler's testimony about the officers' demeanor upon entering the room was that she thought "they were surprised by the amount of stuff that was actually in the room."  (*Id.* at 161 (Hr'g Tr. 161:22-23).)  This demeanor is not inconsistent with Williams' necessarily more limited observation through the window and the fact that it was Stemrich's first observation of the material with no prior word from Williams about what he had seen through the window. Shreffler's connection of the officers' demeanor to her assessment that "there was no way they could have known what was in the room, because the curtains were closed" (*id.* at 162 (Hr'g Tr. 162: 9-11)) does not provide the suggested support.  Her statement that the curtains "were permanently closed, because the way the building was made, there was facets around the side of the curtains, so you could not have seen in the room" (*id.* (Hr'gTr. 162 11-14) does not take into account that Defendants had both opened the curtain slightly to look out into the hallway (*see id.* at 14, 90 (Hr'g Tr. 14:7-15, 90:9-14-16).)  Though officers also testified that Defendants closed the curtain after peering out (*id*.), it is logical

27

that the facets had been disturbed and a gap remained.  This scenario is supported by

Government Exhibit 6 which is a photograph showing a small opening at the side of the

curtain toward the doorway.  (*See* Doc. 89 at 175-76 (Hr'g Tr. 175:25-176:11).)  Though

Shreffler testified that she did not look into the room that night, she insisted that, after the

night at issue, one could not see into the room.  (*Id.* at 176-77 (Hr'g Tr. 176: 24-177:25).)

Given the Government's Exhibit 6 and witnesses' testimony, Shreffler's testimony about

facets and the state of the room after the night in question does not undermine the fact that

a gap existed on the night in question and no evidence shows that Williams could not have

observed something through that opening.  In essence, Shreffler's testimony about the

inability to see through the curtains and that they were fastened with clips at the sides which

precluded looking into the room amounts to testimony about the *usual* state of curtains in

the hotel.  As noted above, Shreffler testified that she did not observe the position of the

curtains that night.  This is not enough to undermine the credibility of Williams' testimony,

supported by photographic evidence, that looking from the hall to the illuminated room, he

was able to see drug paraphernalia inside.

Finally, Defendant Mejia-Bisono's assertion in his brief that the officers' testimony

that they did not direct Shreffler to open the door is not credible (Doc. 95 at 21) does not

change the determination that Defendants were not seized when they acquiesced to the

officers' request that they exit Room 212 earlier in the morning.  At the Suppression

Hearing, the following exchange occurred when Shreffler testified:

28

Q. You have two gentlemen standing outside, one of whom just told you, I locked myself out of the room; right?

A. Um-hum.

Q. So the police said, Hey, you have the master key, would you please open the door for them; right?

A. Correct.

Q. You characterized that to the investigator as a request, not a command; correct?

A. Correct.

Q. You recalled that, at this point in time, the men who were locked out of the room did not say anything to you?

A. The one gentleman did ask me not to open the door, as I just said previously. He asked me not to open the door. But the cops had asked me to open the door, so I opened it.

(Doc. 89 at 178 (Hr'g Tr. 178:12-20).)  This testimony shows that Shreffler did not indicate

that the officers *ordered* her to open the door.  Rather, she assessed the situation and

decided to open the door.  Thus, the officers' testimony that Shreffler asserted her right

under the registration agreement to open the door and they did not *order* her to do so is not

materially inconsistent with the scenario set out above.  *See supra* pp. 9-13.

As will be discussed in greater detail below, given the events of the evening,

including the anonymous tip, suspicious appearance and behavior, Defendants' flight, Lara-

Mejia's arrest, and the discovery of contraband on his person, Williams had ample

information, without including what he observed through the window, to obtain a warrant to

search Room 212.  For all of the reasons discussed above, Defendants' attempts to undermine Williams' and Stemrich's credibility fail.

Essentially, in claiming seizure upon their acquiescence to the officers' request that they exit the room, Defendants point only to the facts that Williams and Stemrich were police officers who knocked on the door more than once and Defendant Mejia-Bisono recognized Williams as an officer who had previously arrested him to support their assertions that they were yielding to the officers' show of authority when they exited the room and a reasonable man would not believe that he was free to do otherwise.  (Doc. 94 at 8; Doc. 95 at 28-29; Doc. 96 at 7.)  However, the cases upon which Defendants rely to support their position are easily distinguishable.

As set out above, in *Johnson*, an officer approached the parked van in which Johnson was sitting and gestured to Johnson to roll down the window.  332 F.3d at 203.  The officer then told Johnson that he "was being detained."  *Id.*  When Johnson did not roll down his window, the officer asked "a few more times" before Johnson complied.  *Id.*

Defendant Mejia-Bisono states that

> [t]he seizure of Lara-Mejia and Mejia-Bisono is even clearer than the seizure of Johnson in *Johnson*. Here, like Johnson, Lara-Mejia and Mejia-Bisono responded to the officers' original request (here, a knock on the door; in Johnson, a "gesture[ ]" to roll down the window) by looking back at the officers through the window, and not by acquiescing by answering the door. *Id.* at 203. This non-acquiescence is tantamount to a refusal to open the door. *See United States v. Ramos*, 923 F.2d 1346, 1356 (9th Cir. 1991) ("A failure to answer a knock and announcement has long been equated with a refusal to admit the search party . . . ."); *United States v. Banks*, 540 U.S. 31, 40 (2003) (suggesting "perhaps five seconds to open a motel room door" as the amount of time

permitting an inference of "refusal" to answer). The officers then persisted by knocking a second time, and by announcing their law enforcement authority (even though the occupants of Room 212 already knew the authority of the uniformed and armed officers) and their desire that the occupants of Room 212 open up.

(Doc. 95 at 28-29.)

Defendant Mejia-Bisono's analogy is unavailing and his conclusion that looking out the window is "tantamount to a refusal to open the door" is unsupported by fact or the cited caselaw. Here the officers did not say anything about being detained, and testimony supports the conclusion that, after a second knock on the door and *request* to talk with officers in the hall, Defendants exited the room without expressing a desire not to do so. The Court finds the fact that Williams and Stemrich gave no indication that the room occupants were being detained to be a significant distinction in the analysis of whether a reasonable person, in the circumstances presented, would have believed he had no choice but to comply with the officers' request. Defendant Mejia-Bisono eliminated this key distinction from his analogy.

The conclusion that looking out the window amounted to a refusal to open the door is not supported by *Ramos* or *Banks*, and Defendant Mejia-Bisono's citation to the cases is disingenuous at best. Both cases address whether police officers complied with the knock and announce requirement *when they executed a search warrant*. In *Ramos*, the Ninth Circuit noted that "[a] failure to answer a knock and announcement has long been equated with a refusal to admit the search party and a justification for forcible entry." 923 F.2d at

1356.  Here, the issue is seizure, not forcible entry while executing a search warrant, and

there was no failure to respond: Defendants looked through the window and conversation

took place between the room occupants and officers before the occupants exited the room.

(See, e.g., Doc. 89 at 44-45.)  In Banks, the Court noted that the time to wait before forcibly

entering a dwelling after a knock when executing a search warrant could be related to the

size of the establishment if the officers justified their entry by claiming that the occupant's

failure to admit them suggested a refusal to let them in which case the occupant could

argue

> that no such suspicion can arise until an occupant has had time to get to the
> door, a time that will vary with the size of the establishment, perhaps five
> seconds to open a motel room door, or several minutes to move through a
> townhouse. In this case, however, the police claim exigent need to enter, and
> the crucial fact in examining their actions is not time to reach the door but the
> particular exigency claimed.

540 U.S. at 39-40.  Thus, considered in context, Defendant Mejia-Bisono's suggestion that

the five seconds mentioned in Banks has anything to do with this case is without merit.

In Hester, an officer approached a parked vehicle to ask the driver of the car (Muse)

a question while Hester was sitting in the passenger seat in factual circumstances which

significantly differ from those present here.  A marked police car pulled up along side the

vehicle and an unmarked car pulled up behind it, the officers then "exited their cruisers and

approached both sides of the vehicle on foot. One of the officers from the marked police car

approached Muse at the driver's side window; the other three approached and stood at the

passenger's side of the vehicle—in this case, on Hester's side."  910 F.3d at 82.  Muse

admitted to driving without a license, and she was then directed to turn off the engine and get out of the car. *Id.* at 82-83. Hester said he could drive, but, as he exited the vehicle, one of the officers heard a gun drop against the floor boards of the car and alerted other officers to the presence of a weapon. *Id.* at 83. At that verbal signal, Hester began to run but was quickly apprehended." *Id.*

The Circuit Court found in *Hester* that, in light of the facts that cars and officers surrounded the parked vehicle and the driver was directed to turn off the engine, a reasonable person would not have felt free "'to ignore the police presence and go about his business.'" 910 F.3d at 86 (quoting *Bostick*, 501 U.S. at 437). While the Circuit Court concluded in *Hester* that the officers' conduct "fell on the seizure side of the line, and was consistent with a show of authority," *id.*, here the officers' conduct is different in kind and degree. Officers did not surround the premises and were not present in such number as would suggest that compliance with a request was mandatory. Further, testimony does not support a finding that Williams and Stemrich ordered, rather than requested, Defendants to do anything during their initial encounter.

Based on the foregoing discussion, the Court concludes that a reasonable person would not have felt obligated to comply with the officers' request to speak with them in the hallway about a reported disturbance in their room and would have felt free to end the encounter once begun. Further, the facts of this case do not support a finding that Defendants acquiesced to a show of authority by Williams and Stemrich at any time before

they fled.  Thus, no illegal seizure occurred before Defendant Lara-Mejia's lawful

apprehension and arrest.  With this determination, Defendant Mejia-Bisono's argument that

officers did not have reasonable suspicion to seize Defendants (Doc. 59 at 1-2) is not

relevant to disposition of the pending motions to suppress.

## B. Standing

The Government asserts that Defendants must establish standing to challenge the

search of Room 212.  (Doc. 66 at 10; Doc. 81 at 8.)  The Government maintains that without

standing there is no basis to challenge a search of the premises and the suppression

motions should be denied.  (Doc. 66 at 10 n.10; Doc. 81 at 9 n.6.)

Standing to claim the protection of the Fourth Amendment depends on whether the

person who claims the protection of the amendment has a legitimate expectation of privacy

in the invaded place.  *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citations omitted).

> [A] defendant moving to suppress evidence seized in a search "bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy" in the subject of the search. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). The latter inquiry turns on two specific questions: "(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances." *Free Speech Coal., Inc. v. Att'y Gen.,* 677 F.3d 519, 543 (3d Cir.2012).

*United States v. Donahue*, 764 F.3d 293, 298–99 (3d Cir. 2014).

When the search involves a hotel room,

> [i] It is well-settled that "[f]rom the overnight guest's perspective," the expectation of privacy in a hotel room is entitled to the same respect as afforded

34

> one's actual home under the Fourth Amendment. *Minnesota v. Olson,* 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Accordingly, "[n]o less than a tenant of a house, or an occupant of a room in a boarding house, ... a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *see also United States v. McNeill,* 285 F. App'x 975, 979 (3d Cir.2008) ("a hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."); *United States v. Coles,* 437 F.3d 361, 365 (3d Cir.2006) ("This Fourth Amendment protection extends to guests staying in hotel rooms.").

*United States v. Donahue*, No. 3:11-CR-0033, 2013 WL 6080192, at *3 (M.D. Pa. Nov. 19, 2013), rev'd in part on other grounds, 764 F.3d 293 (3d Cir. 2014).  Further, courts have recognized that an individual has an expectation of privacy in a hotel room rented under an alias where the renter has exclusive control over the room and the keys.  *Id.* (citations omitted).

The Government assumes that Defendants, though not named registered guests, concede that they were present and occupied the room.  (Doc. 66 at 10 n.6; Doc. 81 at 9 n.6.)  The Government's challenge to Mejia-Bisono's standing is based on the contention that any expectation of privacy he claims to have had in Room 212 was eliminated when he fled the scene before the door was unlocked and concealed himself outside the jurisdiction for approximately seven months.  (Doc. 66 at 11.)

Mejia-Bisono rejects this assertion:

> While a defendant generally has no reasonable expectation of privacy in property that he has abandoned, the rule is different where the defendant abandons the property after law enforcement officers have illegally seized him. In such a case, the defendant retains a reasonable expectation of privacy, and officers' search or seizure of the abandoned property constitutes fruit of the

poisonous tree. *See United States v. Coggins*, 986 F.2d 651, 244 (3d Cir. 1993) ("If Coggins was unlawfully seized, the district court should have suppressed the evidence of the crack cocaine that Coggins discarded while fleeing with Inouye in hot pursuit."). Here, as discussed below, Mr. Mejia-Bisono has set forth evidence from which the Court may infer that PSP officers illegally seized him. The Court must schedule an evidentiary hearing to determine whether Mr. Mejia-Bisono retained a reasonable expectation of privacy in Room 212 because PSP officers caused his abandonment of the room by way of an illegal seizure.

(Doc. 71 at 2-3.)

Regarding Lara-Mejia, the Government contends that he "cannot possess a reasonable expectation of privacy in Room 212 if he continues to suggest, as he does in his pro se letter filed April 22, 2019, that he was present in Room 212 only to purchase drugs, but had no other interest in the room." (Doc. 81 at 9 (citing Doc. 80).) Lara-Mejia did not file a reply brief and, therefore, has not responded to this argument.

Because Defendant Lara-Mejia has not continued to suggest that he was present in Room 212 only to purchase drugs, his standing to challenge the searches of Room 212 remains intact.

Because Defendant Mejia-Bisono's argument that he has standing to challenge the search of Room 212 rests on his assertion that he was unlawfully seized before he fled, the Court's finding that he had not been seized before he fled leaves his standing argument without foundation. Despite this determination, the Court will consider Defendant Mejia-Bisono's arguments regarding the searches of Room 212.

## C. Initial Search of Room 212

The Government contends that no unlawful search occurred because the initial search of Room 212 was incident to Defendant Lara-Mejia's arrest: "Defendants took it upon themselves to flee. To the extent the door was ever unlocked, it was quickly locked again by the manager once the defendants fled. (H.T. 180). Thereafter, entry was made to conduct a protective sweep and to prevent destruction of evidence." (Doc. 93 at 27.) The Government also maintains that exigent circumstances supported a warrantless search of the room. (Doc. 93 at 33-16.) Defendant Mejia-Bisono asserts that "[n]either the 'protective sweep' doctrine nor the 'exigent circumstances' doctrine justifies the officers' search of Room 212." (Doc. 96 at 8-9.) Defendant Lara-Mejia asserts that the Government cannot rely on exigent circumstances because the officers created any purported exigency: they could have obtained a search warrant based on information obtained from the manager prior to any contact with the occupants of Room 212. (Doc. 94 at 12.) He also asserts that the officers could have secured the room after Lara-Mejia's arrest from the exterior, "by creating a perimeter around the hotel room, large enough that would protect law enforcement in the event anyone else was in the hotel room. This perimeter could have been maintained while waiting for a warrant to be secured." (*Id.* at 13.)

### 1. Protective Sweep

As set out above, search of a house without a warrant issued on probable cause is generally unreasonable, but there are several exceptions to the warrant requirement. *See*

*supra pp.* 14-16.  In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court articulated

two exceptions which may come into play following an arrest:

> We ... hold that as an incident to the arrest the officers could, as a precautionary
> matter and without probable cause or reasonable suspicion, look in closets and
> other spaces immediately adjoining the place of arrest from which an attack
> could be immediately launched. Beyond that, however, we hold that there must
> be articulable facts which, taken together with the rational inferences from
> those facts, would warrant a reasonably prudent officer in believing that the
> area to be swept harbors an individual posing a danger to those on the arrest
> scene.

494 U.S. at 334.  The protective sweep described "lasts no longer than is necessary to

dispel the reasonable suspicion of danger."  *Id.* at 335-36.

United States v. White*, 748 F.3d 507 (3d Cir. 2014), explained *Buie's* holding as

follows:

> *Buie* "prong 1" permits a warrantless search of a home "incident to an arrest"
> occurring in the home, provided that the search is limited to those places
> "immediately adjoining the place of arrest from which an attack could be
> immediately launched." *Buie's* "prong 2" authorizes a warrantless search of a
> home based on reasonable and articulable suspicion that the areas being
> searched may "harbor [ ] an individual" who poses a danger to those present
> at the scene of the arrest. "[R]easonable suspicion is a less demanding
> standard than probable cause and requires a showing considerably less than
> preponderance of the evidence." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120
> S.Ct. 673, 145 L.Ed.2d 570 (2000) (internal quotation marks omitted).

748 F.3d at 511.  Noting that "a warrantless search of a home is also permitted 'when the

exigencies of the situation make the needs of law enforcement so compelling that a

warrantless search is objectively reasonable under the Fourth Amendment,'" *id.*

(quoting *Kentucky v. King,* 563 U.S. 452, 460 (2011) (internal quotation marks and

alterations omitted); citing *United States v. Coles,* 437 F.3d 361, 366 n. 8 (3d Cir.2006)),

*White* proceeded to address whether *Buie* applies to an arrest which took place outside the

home.  748 F.3d at 511-12.  Based on the Circuit Court's holding in *United States v.*

*Sharrar*, 128 F.3d 810 (3d Cir. 1997), *White* verified that "a sweep incident to an arrest

occurring just outside the home must be analyzed under the second prong of the *Buie*

analysis" 748 F.3d at 512 (internal quotation and citation omitted).  The Circuit Court then

quoted its earlier holding:

> "Like our sister circuits, we see no reason to impose a bright line rule limiting
> protective sweeps to in-home arrests, as we agree ... that "in some
> circumstances, an arrest taking place just outside a home may pose an equally
> serious threat to the arresting officers." [citing and quoting *United States v.*
> *Colbert,* 76 F.3d 773, 776 (6th Cir.1996) ] Certainly, it would be imprudent to
> prohibit officers who are effecting an arrest or waiting until a warrant may be
> obtained from ensuring their safety and minimizing the risk of gunfire or other
> attack coming from inside the home if they have reason to believe that
> dangerous individuals are inside. Therefore, *in order to determine whether*
> *the protective sweep in question met the standard enunciated by the*
> *Supreme Court in Buie, we must consider whether there was an*
> *articulable basis for a protective sweep, i.e., a warrantless search, under*
> *the circumstances at that time.*"

*White*, 748 F.3d at 513 (quoting *Sharrar*, 128 F.3d at 824) (emphasis added in *White*).

Here Lara-Mejia was apprehended after fleeing into woods near the hotel where the

room from which he fled was located on the second floor.  Because his arrest took place

outside his hotel room, the question of whether the officers entering the room conducted a

protective sweep sanctioned by *Buie* will be considered under *Buie's* second prong.

Further, because the pursuit of Lara-Mejia giving rise to the arrest began right outside his

hotel room door and reports of drug activity in the room gave rise to the officers' presence

on scene, the Court, at this stage of the analysis, will not discount the applicability of *Buie*

based on the proximity of Room 212 to the specific apprehension site.  The propriety of this

course is informed by the Third Circuit's recognition of the importance of a protective sweep

in safeguarding officers who have effected an arrest and are waiting at the scene until a

warrant may be obtained, 748 F.3d at 513, and the officers' expressed intent here to obtain

a warrant and post an officer outside the room until the search warrant could be executed.

(*See*, *e.g.*, Doc. 89 at 103 (Hr'g Tr. 103:10-23).)

The Court will now look to whether the Government has shown that in this case the

warrantless search of Room 212 was supported by "articulable facts which, taken together

with the rational inferences from those facts, would [have] warrant[ed] a reasonably prudent

officer in believing that the area to be swept harbor[ed] an individual posing a danger to

those on the arrest scene."  *Buie*, 494 U.S. at 334.  The Government points to the following

in support of its assertion that the initial search of Room 212 was a protective sweep

sanctioned by *Buie*:

> both Troopers testified that they never would have walked away from Room
> 212 without first obtaining a search warrant under all of the facts and
> circumstances, or to not have engaged in a protective sweep of Room 212.
> (H.T. 35, 103). While securing the necessary paperwork and authorization for
> a search warrant, a PSP officer was going to be posted outside of Room 212.
> (H.T. 103). It was reasonable at that time for trained law enforcement officers
> to guard against potential dangers still present inside Room 212. (H.T. 27-29,
> 99, 102-103). It was reasonable for trained law enforcement officers to wonder
> where "Daniel Pena" was, the identified registrant to the room. At that time, his
> existence could have presented an immediate threat to officers, as well as a

continuing threat as officers remained posted outside to keep the room secured. *Id*. It was also reasonable for trained law enforcement officers to wonder whether the defendants fled from an overdose victim who remained inside. *Id*. It was reasonable for officers to guard against the destruction of evidence in the event another individual was still inside the room. *Id*.

(Doc. 93 at 31.)

Defendant Mejia-Bisono first asserts "inasmuch as the prior illegal seizure of Lara-

Mejia and Mejia-Bisono taints any information contributing to the probable cause that may

have otherwise justified a search of Room 212, the 'protective sweep' doctrine and 'exigent

circumstances' doctrine do not apply." (Doc. 96 at 9.) He next asserts that that there is no

justification for a protective sweep based on the distance between the arrest and Room 212.

(*Id.* at 10.) Mejia-Bisono also seeks to undermine the Government's argument based on

testimony proffered at the Suppression Hearing:

> The officers' testimony concerning their reasons for entering Room 212 after Lara-Mejia and Mejia-Bisono fled does not so much as mention Danial Pena. Rather, the officers offered boilerplate speculation regarding lurking dangers and fantasies such as somebody "possibly overdosing within the room." Williams, Tr. 27:03-29:17; Stemrich, Tr. 98:25-101:16. Such speculation does not amount to the "specific and articulable facts [permitting the reasonable belief] that the area to be swept harbors an individual posing a danger to those on the arrest scene," as required by *Maryland v. Buie*, 494 U.S. 325, 337 (1990).

(Doc. 96 at 10.)

Defendant Lara-Mejia, arguing under the "Exigent Circumstances" heading of his

brief, states that "[t]here was no reason for the Troopers to believe that anyone could

possibly be in the room. No other sounds were coming from the room and there was no

other indication that anyone else was present in the room." (Doc. 94 at 12-13.) He also posits that Williams, if believed that he could see into the room through an opening in the curtains, could have seen someone else in the room. (*Id.* at 12.) Finally, Lara-Mejia speculates that officers, while waiting for a search warrant, could have secured the room by creating a large enough perimeter that would protect law enforcement on scene in the event anyone else was in the room. (*Id.*)

Although the Government's argument articulates safety concerns, the only assertion which relates to the question of whether there was a reasonable belief that "an individual posing a danger" to those on the scene was in Room 212, *see Buie*, 494 U.S. at 337, is that "[i]t was reasonable for trained law enforcement officers to wonder where 'Daniel Pena' was, . . . [and], [a]t that time, his existence could have presented an immediate threat to officers, as well as a continuing threat as officers remained posted outside to keep the room secured" (Doc. 93 at 31). Thus, the question is whether "wondering" about Daniel Pena's location equates with a reasonable belief that he was harbored in Room 212 and posed a danger to officers who would secure the scene until a warrant could be obtained.

The anonymous caller had provided the name Daniel Pena as the person involved with illegal narcotics activity at the hotel, and Williams testified that he was provided that name and the name was connected with Room 212. (Doc. 89 at 38, 200 (Hr'g Tr. 38:15-20, 200:5-8).) When asked what the plan was after Lara-Mejia was arrested, Williams responded, "Get a search warrant and get inside the room and get the narcotics." (*Id.* at 27

42

(Hr'g Tr. 27:2-5).)  He was asked if he had to "secure the room" and answered, "absolutely,

yes."  (*Id*. (Hr'g Tr. 9-10).)  Williams was then asked, "When I say, secure the room, what

does that mean to you?"  (*Id*. (Hr'g Tr. 27:11).)  He responded, "that means I have to make

sure . . . there's nothing in there that's going to either hurt myself, my partner, the public or

harm or destroy or otherwise do anything to the evidence."  (*Id.* at 27 (Hr'g Tr. 89:9-15).)

Stemrich testified that, after Lara-Mejia was in custody, the officers' plan was "[t]o get a

search warrant and to do a safety sweep of the room."  (*Id.* at 99 (Hr'g Tr. 99:1-5).)  In

answer to the question "What do you mean by, safety sweep the room?" (*Id.* (Hr'g Tr.

99:5)), Stemrich explained that

> when we're getting a search warrant on the room, one of us is going to stand
> and maintain the scene's integrity and make sure there's nobody entering or
> exiting the room, anybody that can destroy evidence or anybody that can harm
> us, in any way, while we're guarding this room.
>
> Also, to make sure there's nobody in need of medical attention within
> the room, being that there was drug activity reported.  One male had found
> drugs on him, we wanted to make sure nobody had taken drugs and was
> possibly overdosing within the room.

(Doc. 89 at 99 (Hr'g Tr. 6-15).)

This testimony shows that "Daniel Pena" could reasonably be a person of concern in

that officers knew, from prior contact, that the man who had not been apprehended was

Joel Mejia-Bisono and they knew Johan Lara-Mejia had been arrested.  Thus, "Daniel Pena"

had not been accounted for and was connected to the reported narcotics activity in Room

212.  The name "Daniel Pena" or any other specific individual was not raised during the

testimony about protective sweeps set out above.  In assessing the significance of the absence of an identified specific individual or individuals, it is noteworthy that the questions posed to Williams and Stemrich were generic: to Williams, "When I say, secure the room, what does that meant to you?"; to Stemrich, "What do you mean by, safety sweep the room?".  (*Id.* at 27, 99. (Hr'g Tr. 27:11, 99-5).)  Nevertheless, Stemrich spoke specifically about the circumstances in play on September 10, 2017, and his explanation regarding concerns at the specific scene--"to make sure there's nobody in need of medical attention within the room . . .  to make sure nobody had taken drugs and was possibly overdosing within the room" (Doc. 89 at 99 (Hr'g Tr. 11-15))—does not include an articulation of a belief that a dangerous individual was harbored in Room 212.

Considering facts of record and the testimony presented at the Suppression Hearing, facts articulated about Daniel Pena are scant, and no fact specifically indicates a belief that he or any third person was present in Room 212 when Mejia-Bisono and Lara-Mejia were asked to speak with officers in the hallway and did not exit the room with them.  However, as with the nature of questions asked at the Suppression Hearing, an assessment of the lack of specific testimony about Daniel Pena in the protective sweep context must take into consideration the fact that officers were testifying over two years after the event.  Further, the relevant inquiry is whether articulable facts and rational inferences support a finding that a reasonably prudent officer, on the night in question, would have formed the belief that Room 212 harbored a dangerous individual.

In that vein, officers had only the information relayed by Shreffler, as testified by Williams, that the anonymous caller said that the person to investigate was Daniel Pena. (Doc. 89 at 38 (Hr'g Tr. 38:15-20).)  Shreffler testified that there were two check-ins at the hotel that night: "one was a family, one was, you know, some guys that checked in on the second floor."  (*Id.* at 155 (Hr'g Tr. 1-2).)  She said the name provided by the caller did not match the name of a registered guest.  (*Id.* (Hr'g Tr. 155:5-9).)  Shreffler testified that, when the officers arrived, "They checked over the names that we had registered and the I.D. that we had taken.  They said that it was, you know, a false I.D., so, in that aspect, they decided to go up and knock on the door."  (*Id.* at 156 (Hr'g Tr. 156:13-16).)  Shreffler said that she did not recall the name on the identification and the name "Daniel Pena" did not mean anything to her.  (*Id*. at 171 (Hr'g Tr. 171:1-6).)  She also said that Room 212 was registered to only one guest as far as she knew and she had no recollection of the registrant's name.  (*Id.* (Hr'g Tr. 171:7-11).)  She confirmed that the room "had guys in it," but she had no idea how many; when asked if it could have been two, she responded, "Could have been five, for all I knew."  (*Id.* (Hr'g Tr. 171:15-20).)

Taken together, this testimony means that the only indication that a third person *could be* in the room was a *lack* of information about Daniel Pena and the manager's *lack* of information about how many "guys" were in Room 212.  With no confirmation from the front desk clerk (who watched the interaction outside Room 212 on a video camera (Doc. 89 at 157 (Hr'g Tr. 157:8-14)) that a third individual was associated with Room 212, no report of

noise coming from the room after Mejia-Bisono and Lara-Mejia came into the hallway, and

no suggestion that there was any activity connected with the room while officers were in

pursuit of Mejia-Bisono and Lara-Mejia and taking Lara-Mejia into custody, the Court cannot

conclude that the mere fact that an anonymous caller had associated a name with the room

and that name did not match those of the identified occupants provides the requisite basis

for a protective sweep under *Buie's* second prong.  In other words, because the

Government has not presented "articulable facts which, taken together with the rational

inferences from those facts, would warrant a reasonably prudent officer in believing that the

area to be swept harbors an individual posing a danger to those on the arrest scene," 494

U.S. at 334, the Court cannot conclude that the protective sweep was appropriately

conducted under the standard enunciated in *Buie's* second prong.  Therefore, the Court will

consider whether the initial search of Room 212 was warranted under the exigent

circumstances doctrine.

### 2. Exigent Circumstances

As stated in *United States v. Coles*, 437 F.3d 361 (3d Cir. 2006), "[w]arrantless

searches and seizures inside someone's home (or in this case, a hotel room) are

presumptively unreasonable unless the occupants consent or probable cause *and* exigent

circumstances exist to justify the intrusion.  *Id.* at 365 (citing *Steagald v. United States,* 451

U.S. 204, 211 (1981); *Payton v. New York,* 445 U.S. 573, 586 (1980).  *Coles* points to the

Third Circuit's finding in *United States v. Rubin,* 474 F.2d 262, 268 (3d Cir.1973), that

46

"'[p]robable cause to believe contraband is present is necessary to justify a warrantless

search, but it alone is not sufficient ... Mere probable cause does not provide the exigent

circumstances necessary to justify a search without a warrant.'")  437 F.3d at 366 (quoting

*Rubin*, 474 F.2d at 268).  As set out above, exigent circumstances have been recognized to

exist in several situations, including

> when officers are in hot pursuit of a fleeing suspect, *Coles,* 437 F.3d at 366,
> when they "reasonably ... believe that someone is in imminent danger," *Couden
> v. Duffy,* 446 F.3d 483, 496 (3d Cir.2006) (internal citation and quotation marks
> omitted), or when they reasonably believe that they must act "to prevent the
> imminent destruction of evidence," *Brigham City,* 547 U.S. at 403, 126 S.Ct.
> 1943 (citing *Ker v. California,* 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726
> (1963) (plurality opinion)). The common thread is imminence—"the existence
> of a true emergency." *United States v. Simmons,* 661 F.3d 151, 157 (2d
> Cir.2011).

*United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014).  The government has the

burden of showing that a warrantless search was reasonable based on exigent

circumstances.  *Johnson*, 63 F.3d at 245.

Regarding the probable cause prong of the exigent circumstances inquiry, in *Illinois

v. Gates,* 462 U.S. 213, (1983), the Supreme Court adopted a "totality of the circumstances"

approach to evaluating whether probable cause exists for the issuance of a search warrant.

"[T]he Court identified a 'common sense' aspect to the issue of probable cause, stating that

it is a 'fluid concept-turning on the assessment of probabilities in particular factual contexts-

not readily or even usefully reduced to a neat set of legal rules.'" *United States v. Glasser*,

750 F.2d 1197, 1205–06 (3d Cir. 1984) (quoting *Gates*, 462 U.S. at 232)). As stated in

*Gates*,

> the central teaching of our decisions bearing on the probable cause standard
> is that it is a "practical, nontechnical conception." *Brinegar v. United States,* 338
> U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "In dealing with
> probable cause, ... as the very name implies, we deal with probabilities. These
> are not technical; they are the factual and practical considerations of everyday
> life on which reasonable and prudent men, not legal technicians, act." *Id.,* at
> 175.

462 U.S. at 231.

Considering the totality of the circumstances, here the officers had probable cause to

believe contraband was present in Room 212 based on the anonymous tip, their

observations about Defendants' conduct and appearance (about which they credibly

testified), what appeared to be packaging material viewed through the window, Defendants'

flight, the discovery of multiple bundles of heroin or fentanyl on Defendant Lara-Mejia's

person when he was searched incident to arrest, and the fact that Defendants had occupied

Room 212 immediately before the encounter with police in the hallway. *See supra* pp. 7-12.

With the determination that probable cause existed to believe that contraband

existed in Room 212, the Court will turn to whether the Government has satisfied its burden

of showing that exigent circumstances existed when officers entered Room 212 without a

warrant after Lara-Mejia's arrest. The exigencies identified by the Government are that

> no one knew where Daniel Pena was at that time of if he even existed but it
> was reasonable to believe that he did. Schreffler [sic] confirmed the fact that
> she provided the Troopers with the identification of the person in whose name
> the room was registered (H.T. 171) and it was not either of the defendants.

48

Certainly, guarding against the possibility of a bullet fired from inside at a lone posted law enforcement officer outside was reasonable in this case.

It was further reasonable to conclude that if additional subjects remained inside Room 212, the destruction of evidence already lawfully viewed from outside the room, could likely be destroyed.

(Doc. 93 at 33.)

For the reasons discussed above, the Government had no reasonable basis to *believe* that a person who posed a danger to them was in Room 212. The fact that the identification of the person in whose name the room was rented did not match either of the Defendants does not weigh in favor of exigency or the existence of a third person. The unrefuted testimony indicates that the officers found that the identification provided was false (*see* Doc. 89 at 156 (Hr'g Tr. 156:13-16)), and no testimony or evidence suggests that a third person, i.e., someone other than Mejia-Bisono or Lara-Mejia, had been the room registrant. While a third person in the room--Daniel Pena or another individual--was *possible*, the exigency standard calls for more, and the Government has not presented facts which would support a reasonable belief that a true emergency existed. *Simmons,* 661 F.3d at 157.

## D.  Plain View Doctrine

The Government also asserts that "the plain view doctrine would have permitted warrantless seizures in this case even if a search warrant was not sought and obtained." (Doc. 66 at 19.)  Defendant Mejia-Bisono maintains that the plain view exception does not

apply here because the officers "violated the Fourth Amendment in the course of

accomplishing entry into Room 212." (Doc. 95 at 38.)

"There are three requirements for valid seizures of evidence in plain view. 'First, the

officer must not have violated the Fourth Amendment in arriving at the place from which the

evidence could be plainly viewed.' Second, the incriminating character of the evidence must

be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object

itself.'" *United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (quoting *United States v.*

*Menon,* 24 F.3d 550, 559–60 (3d Cir.1994) (internal quotation omitted)).

The Government argues that

> [h]ere, in light of the justification for the protective sweep amid exigent
> circumstances, law enforcement officers could have lawfully seized all of the
> evidence in plain view inside Room 212. Instead, officers diligently sought and
> obtained a search warrant from a neutral and detached magistrate based upon
> sufficient probable cause that existed even prior to the initial entry.

(Doc. 66 at 19.) Because the Court has not found that the Government satisfied its burden

of showing the warrantless search of Room 212 was allowed as a protective sweep incident

to arrest or based on exigent circumstances, its plain view argument is without foundation.

## E. Inevitable Discovery and Independent Source Doctrines

The Government asserts that, "[w]hile it does not concede any constitutional

violation, the inevitable discovery doctrine allows for admission of evidence that would have

been discovered even without the unconstitutional source." (Doc. 66 at 29.) Defendant

Mejia-Bisono contends that the circumstances presented are "better understood under the

50

independent source doctrine" which is closely related to the inevitable discovery doctrine
(Doc. 95 at 39 n.20), and, under that doctrine, "the illegal seizure of Lara-Mejia and Mejia-
Bisono taints the decision of Williams and Stemrich to seek a warrant to search Room 212"
(*id.* at 35).   Defendant Lara-Mejia also maintains that the independent source doctrine does
not apply here.   (Doc. 94 at 14.)   Based on the parties' arguments, the Court will consider
both doctrines.

### 1. Inevitable Discovery Doctrine

The Supreme Court explained the inevitable discovery exception to the exclusionary
rule in *Nix v. Williams,* 467 U.S. 431 (1984): "[i]f the prosecution can establish by a
preponderance of the evidence that the information ultimately or inevitably would have been
discovered by lawful means ... then the deterrence rationale has so little basis that the
evidence should be received."  *Id.* at 444.  As noted in *United States v. Vasquez De Reyes*,
149 F.3d 192 (3d Cir. 1998), "[t]he rule so applied permits the court to balance the public
interest in providing a jury with all relevant and probative evidence in a criminal proceeding
against society's interest in deterring unlawful police conduct."  *Id.* at 195 (citing *Nix*, 467
U.S. at 443).  The underlying rationale for the inevitable discovery rule is that "the
exclusionary rule ensures that the police should not be in a better position as a result of
their illegal action, but neither should they lie in a worse position."  *Vasquez De Reyes*, 149
F.3d at 194–95; *see also United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing

*Vasquez De Reyes*, 149 F.3d at 195).  The Circuit Court further explained that the

Government's burden can be met

> if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence. *See, e.g., United States v. Martinez–Gallegos,* 807 F.2d 868, 870 (9th Cir. 1987).
>
> . . . Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings. The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred. [*United States v. Kennedy,* 61 F.3d 494, 498 (6th Cir.1995)].

*Vasquez De Reyes*, 149 F.3d at 195.  The Third Circuit Court agreed with the Seventh

Circuit which stated in *United States v. Jones,* 72 F.3d 1324 (7th Cir.1995), that

"[s]peculation and assumption do not satisfy the dictates of *Nix* . . . . Inevitable discovery is

not an exception to be invoked casually, and if it is to be prevented from swallowing the

Fourth Amendment and the exclusionary rule, courts must take care to hold the government

to its burden of proof." *Id.* at 1334 (citations omitted); *Vasquez De Reyes*, 149 F.3d at 196.

The Government specifically contends that after Mejia-Bisono fled from Room 212

and absconded from the jurisdiction for approximately seven months, and after Lara-Mejia

was apprehended and arrested, neither Defendant would have returned to Room 212

before hotel maids showed up to clean the room.  (Doc. 66 at 30; Doc. 81 at 28-29.)  The

Government further contends that, upon entry into the room, Defendants' drugs and

accompanying paraphernalia would have been discovered and police would have been called and come into possession of the evidence.  (*Id.*)

Here, assessment of the inevitable discovery exception requires the Court to determine, viewing affairs as they existed at the instant before the initial entry into Room 212, what would have happened had officers not entered the room.  *See Kennedy,* 61 F.3d at 498.  In the circumstances presented, the Court agrees that neither Defendant would have returned to Room 212 before someone else lawfully entered the room and discovered the drugs therein.  However, given the facts of this case, rather than hotel maids, the next entrants into the room would have been law enforcement personnel executing a search warrant.  This is so because affairs as they existed the instant before officers entered the room include the arrest of Lara-Mejia, discovery of heroin or fentanyl on his person, the officers' knowledge that Defendants had been the occupants of Room 212 just before they fled, an anonymous tip had reported drug activity going on in the room, and officers intended to obtain a warrant to search the room.  Thus, if officers had not entered the room to conduct an initial sweep, they would have applied for a warrant without information gleaned from their initial warrantless search, and the next entry into Room 212 would have been the officers executing the search warrant.  Executing officers certainly would have discovered the evidence which was in plain view in Room 212.

Given this scenario, Defendant Mejia-Bisono correctly asserts that "independent source" analysis is appropriate here.  (Doc. 95 at 39 n.20.)  However, for the reasons discussed below, Mejia-Bisono's application of the doctrine is flawed.

## 2. Independent Source Doctrine

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source."  *Utah v. Streiff*, 136 S. Ct. 2056, 2061 (2016) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)).  In *Nix*, the Supreme Court described the rationale for the doctrine as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

467 U.S. at 443.  *Murray v. United States* explained application of the doctrine in a scenario similar to that presented here:

> Knowledge that the [contraband] was in the [premises] was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one.

*Murray,* 487 U.S. at 541 (citing *Nix,* 467 U.S. at 443.) *Murray* stated the "ultimate question" to be

> whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

487 U.S. at 542.

In this case, the officers' decision to seek a search warrant was clearly not prompted by what they saw when they conducted what they believed to be a search to secure the room. The decision to seek a warrant had been made *before* any officer entered the room. (*See*, *e.g.*, Doc. 89 at 27, 99 (Hr'g Tr. 27:2-5, 99:3-4).) That decision was well-supported independent of the sweep: before entering Room 212, officers had received an anonymous tip about drug activity in Room 212, officers had made numerous observations consistent with drug activity, Defendants had fled, and officers found narcotics in the search of Lara-Mejia's person subsequent to arrest. *See supra* pp. 29, 47-48. A review of the Affidavit presented to the Magistrate Judge shows that she would have issued the warrant absent information regarding what officers saw in plain view when they performed "a cursory search of the room": the issuing Magistrate Judge was informed of the anonymous tip about drug activity in Room 212, Defendants' demeanor and appearance, packaging material consistent with packaging illegal narcotics seen through the window of Room 212, Defendants' flight, and the detention of one suspect. (*See* Doc. 57-1 at 2.)

Defendant Mejia-Bisono's objection to the suppression based on application of the

inevitable source doctrine is flawed because it is based on the erroneous assumption that

Defendants were seized when they came out of their room to talk with Williams and

Stemrich.  He argues as follows:

> Here, it is clear that the illegal seizure of Lara-Mejia and Mejia-Bisono taints the
> decision of Williams and Stemrich to seek a warrant to search Room 212.
> Officer Stemrich conceded that the officers did not have probable cause until
> Williams (purportedly) saw packaging material in plain view when he peeked
> "through the curtains," Stemrich, Tr. 108:07-22, well after the illegal seizure.
> Furthermore, stripping Baron's Affidavit of the information obtained after the
> illegal seizure of Lara-Mejia and Mejia-Bisono leaves only information
> concerning an uncorroborated, anonymous tip, which does not amount to
> reasonable suspicion, to say nothing of probable cause. Accordingly, the
> independent source doctrine does not justify the search authorized by the
> Warrant.

(Doc. 95 at 40-41.)  As Mejio-Bisono's foundational premise is incorrect, i.e., that an illegal

seizure occurred, this basis for asserting that the independent source doctrine does not

justify the search is wrong.

Defendant Lara-Mejia maintains that, absent the packaging material seen through

the window, "the only evidence contained in the Affidavit of Probable Cause regarding

contents of the room had to have come from the unconstitutional search of Room 212."

(Doc. 94 at 14.)  This argument has at least two flaws: it assumes that probable cause to

search Room 212 hinged on material having been observed in the room before entry, and it

assumes that the information about packaging material seen through the window is

materially false.  Neither assumption is warranted.

56

Even without information about packaging material viewed through the window, the

Magistrate Judge had ample information to find probable cause.[7]  Based on the factual

context presented (including the tip of drug activity in Room 212, Defendants' suspicious

behavior and appearance, and Defendants' decision to flee as Shreffler was opening the

door to their room) a reasonable and prudent man's "assessment of probabilities" of

whether drugs were present in Room 212 would come to the common-sense conclusion

that illegal drugs were probably located in the room.[8]  *See Gates*, 462 U.S. at 231; *see*

*supra* pp. 47-48.

The assumption that the evidence concerning what Williams viewed through the

window was not properly considered as support for the Affidavit is based on a preliminary

assumption that Defendants have proven by a preponderance of the evidence that the

statement in the Affidavit was false and it was made knowingly or recklessly such that it

---

[7] Interestingly, Defendant Lara-Mejia asserts earlier in his supplemental brief that officers could have obtained a search warrant even before they had a conversation with Defendants: "Troopers, based on the information obtained from the manager, could have obtained a search warrant prior to any conversation with or contact with the occupants of Room 212." (Doc. 94 at 12 (citing *United States v. Coles*, 437 F.3d 361, 370 (3d Cir. 2006)).

[8] Defendant Mejia-Bisono states that "Officer Stemrich conceded that the officers did not have probable cause until Williams (purportedly) saw packaging material in plain view when he peeked 'through the curtains,' Stemrich, Tr. 108:07-22, well after the illegal seizure." (Doc. 95 at 40.)  As discussed in the text, because no illegal seizure occurred, the statement is not relevant to the application of the independent source doctrine.  Insofar as the statement relates to probable cause, it has no impact on the Court's determination that probable cause existed absent the information gleaned from Williams' window view. This is so because Stemrich's statement, considered in context, shows that he believed the officers had probable cause to arrest Defendants "where he went, physically, towards the manager to stop them, and upon them running" in addition to what Williams had seen in the room.  (Doc. 89 at 108-09 (Hr'g Tr. 108:7-09:18).)  Though Mejia-Bisono's counsel diligently attempted to establish that Stemrich believed Williams' information was essential to probable cause in general, his attempts were unsuccessful.  (*See* Doc. 89 at 107-09),

must be excised from the Affidavit with the result that probable cause does not exist without it. *See Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Yusuf*, 461 F.3d 374, 383-84 (3d Cir. 2006).

Defendants have made no such showing. Defendant Lara-Mejia's conclusory statements (Doc. 94 at 14) do not satisfy his burden. Defendant Mejia-Bisono puts forth law and conclusions about false statements in the Affidavit in his supplemental brief, but he too does so in a conclusory fashion. (*See* Doc. 95 at 20, 43-44.) In sum, the Court will not attempt to piece together a foundation for Defendants' assertions and assumptions that Baron's Affidavit contains false statements material to the finding of probable cause where Defendants themselves have not done so. (*See* Docs. 94, 95.)

As discussed previously, the Court did not find Williams not to be credible regarding his ability to view packaging material through the gap in the curtains of Room 212. *See supra* pp. 26-28. Although testimony reveals some discrepancy as to where the packaging material was viewed, i.e., whether on the bed or on the table moved to the rear of the room or both (*see, e.g.*, Doc. 89 at 73-75 (Hr'g Tr. 73:8-75:19)), the Court does not find that the discrepancy gives rise to a material misstatement. Williams consistently documented packaging material seen through the window, he consistently said he could see the bed and the table, and he explained more than once that what was on the table was not clearly visible but the setup was consistent with a narcotics packaging operation. (*See, e.g.*, Doc. 57-1 at 2; Doc. 89 at 21-22, 72-81; Gov't Ex. 32.) Further, photographic evidence shows a

gap in the curtains which would allow a limited view into the lighted room, the beds and table which had been moved to the rear of the room could logically have been seen from the limited view through the window, and an unclear view of what was on the tabletop could be considered consistent with drug activity. (*See* Gov't Exs. 6, 9, 11.)   Finally, the fact that Williams did not reveal the information about what he had viewed when alone in the hallway until after Defendants fled indicates that he was not using the information to gain access to Room 212 before numerous other events giving rise to probable cause had occurred, i.e, Mejia-Bisono's aggressive move toward Shreffler, Defendants' flight, and the discovery of narcotics on Lara-Mejia's person in the search incident to his arrest. Thus, with ample readily verifiable evidence to establish probable cause for the issuance of a search warrant, Williams had no reason to fabricate surplusage.

For all of these reasons, the Court finds no inconsistency *material* to the Magistrate Judge's determination that a warrant should be issued based on Baron's Affidavit of Probable Cause drafted after he received relevant information from Williams.   In turn, Defendants provide no reason to conclude that, absent evidence gleaned from the warrantless initial search of Room 212, the Magistrate Judge would not have had probable cause to issue the warrant.   In other words, the issuance of the warrant was not dependent on information included therein regarding what was seen during the initial search of Room 212 with the result that the search pursuant to the warrant was an independent source of the evidence seized.   Because the evidence seized pursuant to the search warrant was not

the result of the warrantless entry, this is a situation where "invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Murray,* 487 U.S. at 541. With this determination, evidence seized in the search executed pursuant to the warrant will not be suppressed based on application of the independent source doctrine.[9]

### V.  CONCLUSION

Because Defendant Johan Lara-Mejia did not file a brief in support of his Motion to Dismiss Count 5 – 18 U.S.C. § 924(c) (Doc. 69), the motion will be deemed withdrawn

---

[9] Although the Court found that Defendant Mejia-Bisono lacks standing to challenge the search of Room 212 and need not have further discussed his arguments on the issue, for the sake of clarity and completeness, the Court addressed many arguments raised by Mejia-Bisono related to the propriety of the search of Room 212 under the Fourth Amendment.  However, this inclusive approach has limits.  For example, the Court declines to consider an assertion made in Mejia-Bisono's reply brief that Williams' looking through the gap in the curtains constituted a search for Fourth Amendment purposes.  (*See* Doc. 96 at 15 (citing *United States v. Christy*, 810 F. Supp. 2d 1219 (D.N.M. 2011)).)  An argument made for the first time in a reply brief is waived.  *See, e.g., Loving v. FedEx Freight, Inc.*, Civ. A. No. 3:18-CV-508, 2020 WL 2306901, at *14 (M.D. Pa. May 8, 2020) (citation omitted).  Further, the Court declines to consider Mejia-Bisono's District of New Mexico District Court case cited above which presents distinguishable facts and is of no persuasive value.

Similarly, the Government's notation in the margin of the Brief of the United States in Opposition to Joel-Mejia-Bisono's Motion for Suppression of Evidence that "the good faith exception to a defective warrant applies here" (Doc. 66 at 28 n.11) will not be analyzed because it does not apply law to fact as is the Government's burden, *Taylor v. Alabama*, 457 U.S. 687, 690 (1982); *United States v. Dupree*, 617 F.3d 724, 738–39 (3d Cir. 2010); *United States v. Pelullo*, 173 F.3d 131, 138 (3d Cir. 1999).  However, a cursory review of the issue indicates that facts of record could readily support a finding that the exception would be available and the exclusionary rule would not apply because no evidence suggests that officers did not act "upon an objectively reasonable good faith belief in the legality of their conduct."  *United States v. Katzin*, 769 F.3d 163, 182  (3d Cir. 2014).

pursuant to Local Rule 7.5 of the Local Rules of Court of the Middle District of Pennsylvania.

Defendant Joel Mejia-Bisono's Motion to Supplement Motion to Suppress Evidence

Obtained in Violation of the United States Constitution (Doc. 59) will be granted.  Defendant

Joel Mejia-Bisono's Motion to Suppress Evidence Obtained in Violation of the United States

Constitution (Doc. 56) will be denied.  Defendant Johan Lara-Mejia's Motion to Suppress

Evidence (Doc. 70) will be denied.  A separate Order is filed simultaneously with this

Memorandum Opinion.

Robert D. Mariani
United States District Judge